## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on _____**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : **CRIMINAL NO.** |
| | : |
| **v.** | : **GRAND JURY ORIGINAL** |
| | : |
| **TYRONE GRANDBERRY,** | : **VIOLATIONS:** |
| | : |
| a/k/a "Tyrone Staindl," | : **18 U.S.C. § 1343** |
| | : **(Wire Fraud)** |
| **Defendant.** | : |
| | : **18 U.S.C. § 1956(h)** |
| | : **(Money Laundering Conspiracy)** |
| | : |
| | : **18 U.S.C. § 1956(a)(1)(B)(i)** |
| | : **(Money Laundering)** |
| | : |
| | : **18 U.S.C. § 1957** |
| | : **(Engaging in Monetary Transactions)** |
| | : |
| | : **18 U.S.C.§ 1028A** |
| | : **(Aggravated Identity Theft)** |
| | : |
| | : **18 U.S.C. § 1344(2)** |
| | : **(Bank Fraud)** |
| | : |
| | : **18 U.S.C. § 1546(a)** |
| | : **(Document Fraud)** |
| | : |
| | : **22 D.C. Code § 3221(a)** |
| | : **(First Degree Fraud)** |
| | : |
| | : **FORFEITURE:** |
| | : **18 U.S.C. § 982(a)(1)(C);** |
| | : **28 U.S.C. § 2461(c); and** |
| | : **21 U.S.C. § 853(p)** |

## INDICTMENT

The Grand Jury charges that:

1

## INTRODUCTION

At times material to this indictment:

1.     Defendant TYRONE GRANDBERRY ("GRANDBERRY"), also known as "Tyrone Staindl," was a resident of Woodbridge, Virginia.

2.     GRANDBERRY owned and controlled CHALLENGER CAPITAL LIMITED ("CHALLENGER"), a company organized under the laws of the United Kingdom.

3.     GRANDBERRY owned and controlled G GROUP INTERNATIONAL, LLC ("G GROUP"), a company organized under the laws of Delaware.

4.     GRANDBERRY owned and controlled JAG HOLDINGS TRUST, LLC ("JAG HOLDINGS"), a company organized under the laws of Maryland.

5.     GRANDBERRY owned and controlled B&G EDUCATIONAL PROGRAM ("B&G"), an unincorporated association.

6.     GRANDBERRY owned and controlled OCEAN 27 HOLDINGS, LLC ("OCEAN 27"), a company organized under the laws of Florida.

7.     GRANDBERRY owned and controlled OCEAN 27 INTERNATIONAL, LLC ("OCEAN 27 INTERNATIONAL").

8.     GRANDBERRY effectively maintained sole control over the business operations, accounts, and property owned or used by CHALLENGER, G GROUP, JAG HOLDINGS, B&G, OCEAN 27, and OCEAN 27 INTERNATIONAL (collectively, the "SHELL COMPANIES"). GRANDBERRY used the existence of the SHELL COMPANIES to provide himself a title, to provide himself the appearance of legitimacy, and to obtain bank accounts that GRANDBERRY could use to receive and re-transmit the proceeds of his operations.

## OVERVIEW OF THE CRIMINAL ACTIVITY

9.      Between at least March 2012 and about October 2016, GRANDBERRY used the SHELL COMPANIES to conduct fraud and money laundering schemes to enrich himself.

10.     Between at least March 2012 and October 2016, with intent to defraud, GRANDBERRY used the SHELL COMPANIES to carry out an investment fraud scheme whereby GRANDBERRY solicited "investments" from victims through materially false and fraudulent representations; used the victims' investments for his own benefit; sustained the scheme through false and fraudulent claims; sustained the scheme by falsely blaming third parties; sustained the scheme by partially repaying old victims with money obtained from new victims; and sustained the scheme through money laundering and bank fraud intended to obtain, conceal, and retain the proceeds.

11.     Between at least October 2014 and May 2015, GRANDBERRY used the SHELL COMPANIES to carry out a money laundering conspiracy with Raymond Ho ("HO"), an attorney from Virginia, and a subject known only as Chief Onwa ("CHIEF ONWA"), who is believed to reside outside of the United States.   As part of the conspiracy, GRANDBERRY agreed to provide bank accounts that could receive and re-transmit funds derived from specified unlawful activity. GRANDBERRY agreed to receive and re-transmit those funds knowing that they were derived from criminal activity, because GRANDBERRY would receive a share of the proceeds.

## INVESTMENT AND BANK FRAUD SCHEMES

### Investment by S.G.

12.     S.G. was a resident of the United Kingdom who was referred to GRANDBERRY in 2012.  GRANDBERRY, who claimed to be working through CHALLENGER and G GROUP,

3

offered to facilitate an investment that would be executed by H.L., who GRANDBERRY claimed was an experienced trader, using the E*TRADE platform.

13.    During May 2014, GRANDBERRY solicited S.G.'s investment through materially false and fraudulent pretenses, promises, and representations.   He falsely claimed to have successful experience with H.L. and the E*TRADE program; he falsely claimed, without any reasonable basis, that S.G.'s investment would generate daily returns of 2-4%; and he fraudulently claimed that he would ensure that all of S.G.'s $125,000 would be invested through the E*TRADE platform.   In fact, GRANDBERRY intended to use tens of thousands of dollars of S.G.'s money in an undisclosed and unauthorized manner.

14.    Induced by and in reliance on GRANDBERRY's representations, S.G. invested $125,000 through GRANDBERRY.   On or about June 1, 2012, S.G. wired $125,000 to a bank account held by JAG HOLDINGS.

15.    GRANDBERRY did not use S.G.'s investment as promised.    Instead, he immediately used $25,000 of S.G.'s investment for his own purposes.   In addition, in about June and July 2012, he obtained and used an additional $50,000 of S.G.'s investment.

16.    GRANDBERRY sent fraudulent documents falsely claiming that S.G.'s investment was growing throughout August 2012, at one point falsely claiming that S.G.'s $125,000 investment was worth over $700,000.   When S.G. asked to "cash out" his investment in September 2012, GRANDBERRY responded by claiming that H.L. had stolen the money and disappeared. GRANDBERRY did not disclose that he had personally used $75,000 of S.G.'s money.

4

## Investment by E.E.

17. E.E. was a resident of Virginia and an acquaintance of GRANDBERRY. GRANDBERRY told E.E. that he could help E.E. invest through an E*TRADE platform that would generate lucrative returns. GRANDBERRY planned to use CHALLENGER and JAG HOLDINGS to solicit and receive E.E.'s investment.

18. During September 2014, GRANDBERRY solicited E.E.'s investment through materially false and fraudulent pretenses, promises, and representations. GRANDBERRY falsely claimed to have successful experience with the E*TRADE trading platform; he falsely claimed, without any reasonable basis, that E.E.'s investment would generate weekly returns of 20%; and he fraudulently claimed that he would ensure that E.E.'s $100,000 would be invested. In fact, GRANDBERRY intended to use E.E.'s investment money in an undisclosed and unauthorized manner.

19. However, induced by and in reliance on GRANDBERRY's representations, E.E. invested $100,000 through GRANDBERRY. On or about September 20, 2012, E.E. wired $100,000 to an account held by JAG HOLDINGS.

20. GRANDBERRY did not use E.E.'s investment as promised. In fact, although GRANDBERRY sent a document purporting to be a receipt for a $150,000 wire transfer from JAG HOLDINGS to E*TRADE, GRANDBERRY did not wire E.E.'s money to any E*TRADE account. Instead, GRANDBERRY used E.E.'s money for unauthorized purposes, for his own personal benefit, including to repay a previous victim and to make rent payments.

21. GRANDBERRY sent fraudulent documents falsely claiming that E.E.'s investment was growing until at least March 2013. When E.E. asked to withdraw his investment and profits in 2013, GRANDBERRY did not return the investment or provide any profits.

Investment by A.M.

22. A.M. was a resident of Georgia who discussed potential investments with GRANDBERRY. During those discussions, GRANDBERRY appeared to be working with T.R., a third-party with his own separate company, but ultimately, GRANDBERRY solicited A.M.'s investment and was responsible for the disposition of A.M.'s money.

23. During March 2014, GRANDBERRY solicited A.M.'s investment through materially false and fraudulent pretenses, promises, and representations. GRANDBERRY falsely claimed, without any reasonable basis, that A.M.'s $150,000 investment would grow to $900,000; and he falsely claimed that all of A.M.'s money would be invested in a "private placement program" involving "banking instruments." In fact, GRANDBERRY intended to use A.M.'s money in an undisclosed and unauthorized manner.

24. However, induced by and in reliance on GRANDBERRY's representations, A.M. invested $150,000 with GRANDBERRY. On or about March 31, 2014, from a location in Florida, A.M. wired $150,000 to an account held by OCEAN 27 INTERNATIONAL.

25. GRANDBERRY did not use A.M.'s investment as promised. He used thousands of A.M.'s dollars for unauthorized purposes, the sole exception being a $5,000 payment to A.M.

26. When the thirty-day period for A.M.'s investment expired, GRANDBERRY became hard to reach. He did not provide the promised $750,000, and did not return A.M.'s principal.

## Investment by J.G. and Ventricle

27.    J.B. and J.G. were residents of Maryland.   In 2015, J.B. had been working to develop potential investors with GRANDBERRY.   GRANDBERRY and J.B. were working to develop investors for "Standby Letter of Credit," or "SBLC," transactions.   J.B. conducted his business through Ventricle Advisory Consultants, LLC ("VENTRICLE").

28.    J.B. knew that J.G. was looking for investment options and solicited J.G. for an SBLC investment.   J.B. provided J.G. with information about the SBLC investment.   That information was derived from GRANDBERRY.   In fact, although GRANDBERRY did not have any direct communications with J.G., GRANDBERRY provided information and documents to J.B., knowing that J.B. would provide that information and those documents to J.G. GRANDBERRY thus worked to ensure that J.G.'s money would be sent to OCEAN 27.

29.    J.B. and J.G. ultimately agreed that J.G. would fund the investment; that they would use VENTRICLE as a formal investment vehicle; and that J.G. and J.B. would share in VENTRICLE's profits.   GRANDBERRY knew about this arrangement.

30.    GRANDBERRY knowingly ensured that J.G.'s investment would be solicited through materially false and fraudulent pretenses, promises, and representations. GRANDBERRY provided false information that led J.G. to believe that his/VENTRICLE's money would be used to obtain an SBLC from TD Bank, when in fact, GRANDBERRY intended to and would use that money in an undisclosed and unauthorized manner.

31.    In addition, GRANDBERRY knowingly provided false information that led J.G. to believe that his/VENTRICLE's investment would be "blocked" in a TD Bank account; that VENTRICLE would thereby obtain a $5,000,000 SBLC; that a third party would "monetize" the

7

SBLC through financial trading; and that VENTRICLE would ultimately receive a "forgivable loan" of $2,500,000, which he and VENTRICLE would never need to repay, and which would serve as his/VENTRICLE's investment return.

32.     However, induced by and in reliance on the information and documents provided by GRANDBERRY, J.G. invested with J.B., VENTRICLE, and GRANDBERRY.   On or about May 1, 2015, J.G. wired $250,000 from a family trust to VENTRICLE, and, on or about May 4, 2015, VENTRICLE wired $200,000 to a bank account held by OCEAN 27.

33.     GRANDBERRY did not use VENTRICLE's investment in the manner that was promised.   Instead, he used money from VENTRICLE in an undisclosed and unauthorized manner, using $40,000 for overdue rent, sending $10,000 to a Panamanian bank account held by his girlfriend, and processing several thousand dollars in purported "payroll" to his girlfriend.

34.     GRANDBERRY continued the scheme by sending fraudulent documents that falsely claimed that VENTRICLE's investment remained "blocked" in the TD Bank account and by forging a document that purported to be an SBLC.   Finally, because GRANDBERRY had never invested VENTRICLE's money, when enough time had passed that the investment should have matured, GRANDBERRY did not provide the promised $2,500,000 forgivable loan.   Continuing through at least December 2015, J.G. and J.B. demanded that GRANDBERRY provide information and a return of the investment.

### Investment by Octafin

35.     Octafin AG ("OCTAFIN") was a corporate entity based in Switzerland.   In late 2015, OCTAFIN was seeking to make an investment with M.P., an associate of GRANDBERRY.

8

M.P. conducted business through a company that he controlled.  GRANDBERRY worked with M.P. and that company to solicit OCTAFIN's investment.

36.    GRANDBERRY did not have direct contact with OCTAFIN.  Instead, OCTAFIN communicated directly with M.P., and M.P. communicated directly with GRANDBERRY. GRANDBERRY was aware that OCTAFIN was the source of funds for the investment. GRANDBERRY also knew that information which he provided to M.P. would ultimately be provided to OCTAFIN; that OCTAFIN was seeking an SBLC from TD Bank; and that M.P. had told OCTAFIN that it would obtain an SBLC through OCEAN 27, based on a €3,000,000 wire transfer (then worth about $3,274,000) to a TD Bank account held in the name of OCEAN 27. GRANDBERRY thus worked to ensure that OCTAFIN's money was directed to OCEAN 27.

37.    GRANDBERRY knowingly ensured that OCTAFIN's investment would be solicited through materially false and fraudulent pretenses, promises, and representations. GRANDBERRY provided false information that led OCTAFIN to believe that $3,000,000 of its investment money would be "blocked" in a TD Bank account, where it would be used to obtain an SBLC from TD Bank.  In fact, before OCTAFIN sent its investment, GRANDBERRY knew he would use hundreds of thousands of dollars of OCTAFIN's money in an undisclosed and unauthorized manner.

38.    In addition, in November and December 2015, GRANDBERRY knowingly provided materially false information that led OCTAFIN to believe that M.P. controlled OCEAN 27 and that GRANDBERRY was not involved in OCEAN 27, and that M.P. controlled OCEAN 27's bank accounts and that GRANDBERRY did not have control over the bank accounts.

GRANDBERRY provided materially false information knowing that OCTAFIN had specifically asked for those assurances.

39.     Similarly, on about December 8, 2015, before GRANDBERRY had received OCTAFIN's investment money, M.P. asked GRANDBERRY to confirm that TD Bank would issue an SBLC.   GRANDBERRY responded by forging an e-mail that falsely appeared to have been sent from TD Bank, which stated, "as soon as we receive the copy of the application we will forward to Global Investment team to process the Standby letter of credit and leveraging."

40.     The very next day, on December 9, 2015, OCTAFIN's €3,000,000 wire transfer was transmitted by OCTAFIN's bank to an OCEAN 27 bank account at TD Bank.

41.     GRANDBERRY did not ensure that $3,000,000 OCTAFIN's money was "blocked" in a TD Bank account and used to obtain an SBLC.   Instead, between December 10, 2015, and January 24, 2016, GRANDBERRY used over $1,150,000 of OCTAFIN's money for purposes unrelated to the investment as promised and represented, such that only about $2,121,000 remained in the OCEAN 27 account.   For example, on December 10, 2015, GRANDBERRY wired $640,000 of OCTAFIN's investment money to an account held by OCEAN 27 INTERNATIONAL. GRANDBERRY later used that $640,000 to make payments to S.G., C.F., E.E., and VENTRICLE, and for breast enhancement plastic surgery for his girlfriend.   For example, on December 11, 2015, GRANDBERRY wired $100,000 to VENTRICLE.

42.     GRANDBERRY continued the scheme in December 2015 and continuing through at least May 2016.   To do so, GRANDBERRY sent documents falsely claiming that $3,000,000 of OCTAFIN's investment remained "blocked" in the TD Bank account.

Bank Fraud Scheme

43.    In January 2016, TD Bank began investigating the transaction between OCTAFIN and OCEAN 27.  On January 24, 2016, a bank investigator questioned GRANDBERRY.  When asked, GRANDBERRY deceptively minimized his knowledge about the wire transfer and the underlying transaction; falsely claimed that the wire was related to a building project in London; and falsely claimed that he could not remember the full names of people working on the deal.

44.    On January 22, 2016, TD Bank placed an administrative hold on OCEAN 27's bank account, effectively freezing OCTAFIN's remaining investment money, about $2,121,000, pending an investigation.

45.    On January 26, 2016, for the purposes of regaining access to OCTAFIN's investment money, GRANDBERRY visited his local TD Bank branch office in Woodbridge, Virginia, and asked for a small business loan application.  GRANDBERRY spoke to TD Bank employee A.E., discussed the hold on his bank account, and falsely claimed that the OCTAFIN investment money was related to a high-end restaurant in Miami, Florida.  A.E. suggested that GRANDBERRY should retain an attorney, and offered to introduce GRANDBERRY to a Washington, D.C.-based attorney, B.S.  In order to maintain the appearance of legitimacy and further his efforts to regain access to OCTAFIN's money, GRANDBERRY agreed that A.E. should send an e-mail introduction to GRANDBERRY and the attorney.  A.E. sent the e-mail as a result.

46.    On January 27, 2016, for the purposes of regaining access to OCTAFIN's investment money, GRANDBERRY submitted to a "Small Business Loan Application" which indicated his desire to obtain a $3,000,000 SBLC from TD Bank.  GRANDBERRY's application

falsely asserted that the proceeds would be used for an office in Miami; and falsely claimed that OCEAN 27 had annual gross receipts of $2,000,000, and annual net profits of $2,000,000.

47.     TD Bank maintained its hold on the OCEAN 27 account and GRANDBERRY continued seeking to regain access to OCTAFIN's money.  In furtherance of those efforts, on or about August 18, 2016, GRANDBERRY caused an attorney, W.J., to inform TD Bank that he represented OCEAN 27 and to ask TD Bank to contact him (W.J.) by e-mail or by mail to his office in Washington, D.C.  On September 9, 2018, TD Bank responded by mailing a letter to W.J.'s law offices in Washington, D.C.  This provided W.J. with a contact point, so that W.J. could negotiate the return of OCTAFIN's money to OCEAN 27 and GRANDBERRY.

48.     In September 2016, J.B. told GRANDBERRY that bank investigators had contacted him (J.B.) about the money GRANDBERRY had sent to VENTRICLE in December 2015 – money GRANDBERRY knew had been derived from OCTAFIN's investment and which GRANDBERRY knew had in fact been used to partially repay investment funds of which J.G., J.B., and VENTRICLE had been defrauded.

49.     On or about September 21, 2016, GRANDBERRY met BENJAMIN in Washington, D.C.  GRANDBERRY hoped that the meeting would further his efforts to regain access to the frozen money at TD Bank, and that it would also reduce the chances that J.B. would suspect and report that GRANDBERRY had defrauded VENTRICLE (and J.B. and J.G.) in connection with its own investment.

50.     During the meeting, GRANDBERRY provided false explanations for the failure of the VENTRICLE investment, explained that the repayment to VENTRICLE had been funded by

12

an investment from Switzerland, and also claimed that, if he obtained access to the frozen money at TD Bank, he would then be able to provide VENTRICLE the profits from its investment.

## MONEY LAUNDERING CONSPIRACY

51.     In about October 2014, HO contacted GRANDBERRY about an opportunity to work with an individual known only as CHIEF ONWA.  CHIEF ONWA was a foreign national who wanted assistance from someone with United States bank accounts, who could receive and quickly re-transmit money to foreign bank accounts.  HO had been providing the same service to CHIEF ONWA, but had encountered difficulties because HO's banks flagged CHIEF ONWA's transactions as fraudulent and closed some of HO's bank accounts.  HO believed that GRANDBERRY might be able to provide CHIEF ONWA the assistance that he needed.

52.     CHIEF ONWA was part of a "business e-mail compromise" operation, whereby the perpetrators sent fraudulent requests for wire transfers from victim bank accounts.  The perpetrators typically impersonated the true owners of victim bank accounts or the legitimate recipients of payments, either by hacking into the victim's e-mail accounts or by spoofing the victim's e-mail accounts.  In order to successfully obtain and keep the resulting wire transfers, CHIEF ONWA needed U.S. bank accounts to receive the fraudulently-obtained funds, and needed those funds to be re-transmitted quickly, before the fraud was detected and the wire transfers were recalled.

53.     HO did not know the specifics of CHIEF ONWA's underlying fraud scheme, but HO knew that CHIEF ONWA's money was derived from criminal activity.  In addition to the money-laundering nature of CHIEF ONWA's requests, in rejecting transactions and closing HO's bank accounts, HO's banks had provided notice that they had detected "fraud" in the transactions.

54.     When HO contacted GRANDBERRY to help CHIEF ONWA, HO told GRANDBERRY that some of his accounts had been closed because of CHIEF ONWA's transactions, and that HO's bank's had cited "fraud" as the reason for closing the accounts. GRANDBERRY nonetheless agreed to receive and re-transmit CHIEF ONWA's wire transfers, despite knowing that CHIEF ONWA's wire transfers were derived from criminal activity.

55.     GRANDBERRY, HO, and CHIEF ONWA agreed that CHIEF ONWA's wire transfers would be coordinated with all three participants; that GRANDBERRY would maintain bank accounts that he would use to receive and quickly re-transmit CHIEF ONWA's wire transfers; that CHIEF ONWA would provide prior notice of each wire transfer; that GRANDBERRY and HO would each obtain a percentage-based fee of each wire transfer; and that GRANDBERRY would then re-transmit the bulk of the funds to foreign bank accounts designated by CHIEF ONWA.

### $120,000 Wire Transfer To B&G

56.     On or about October 29, 2014, as part of CHIEF ONWA's fraud scheme, and based on a fraudulent e-mail that falsely appeared to have been sent by victim I.E., a Washington, D.C.-based accounting employee wired $120,000 from I.E.'s Wells Fargo Bank account to a B&G account at SunTrust Bank – an account controlled by GRANDBERRY.

57.     GRANDBERRY, HO, and CHIEF ONWA had communicated about the $120,000 wire transfer before any money was transferred to the B&G account, and GRANDBERRY had confirmed that he was ready to re-transmit the funds within 24 hours of receipt.

58.     The wire transfer was initially successful.  However, the fraud was detected before GRANDBERRY was able to re-transmit the funds.  SunTrust Bank returned the relevant funds to

14

I.E.'s bank account (minus a fee that had been credited to the B&G account) and notified GRANDBERRY that the wire transfer had been recalled for "fraud."

### $400,000 Fraudulent Wire Transfer To OCEAN 27

59.     On or about November 19, 2014, as part of CHIEF ONWA's fraud scheme, and based on a fraudulent e-mail that falsely appeared to have been sent by an attorney, a Louisiana-based employee of Ouachita Independent Bank wired $400,000 to an OCEAN 27 account at Bank of America – an account controlled by GRANDBERRY.

60.     GRANDBERRY, HO, and CHIEF ONWA had communicated about the $400,000 wire transfer before any money was transferred into the JAG HOLDINGS account, and GRANDBERRY had confirmed that he was ready to re-transmit the funds.

61.     On November 20, 2014, GRANDBERRY re-transmitted about $382,000 of the fraudulently-procured $400,000, including by sending approximately $307,000 to bank accounts in China, Panama, and South Africa, as well as $55,000 to a TD Bank account held by OCEAN 27. GRANDBERRY used a portion of that $55,000 to fund a $5,000 payment to prior victim E.E.

62.     Shortly after the $400,000 wire, but after GRANDBERRY had re-transmitted the above-noted $382,000, Bank of America notified GRANDBERRY that the wire had been the subject of a recall request based on reported fraud.

### $131,000 Fraudulent Wire Transfer To JAG HOLDINGS

63.     On or about January 23, 2015, as part of CHIEF ONWA's fraud scheme, and based on a fraudulent e-mail that falsely appeared to have been sent by the seller's agent in a real estate transaction, an Louisiana-based employee of a title company caused $131,000 to be wired to a JAG HOLDINGS account at Capital One Bank – an account controlled by GRANDBERRY.

15

64.     GRANDBERRY, HO, and CHIEF ONWA had communicated about the $131,000 wire transfer before any money was transferred into the OCEAN 27 account, and GRANDBERRY had confirmed that he was ready to re-transmit the funds.

65.     On or about January 26, 2015, GRANDBERRY re-transmitted $110,000 of the fraudulently-procured $131,000 to an OCEAN 27 account at TD Bank, where it was transmitted again, including to a company in South Africa.   By January 29, 2015, GRANDBERRY had used thousands of dollars more, and all but $23 of the fraudulently-procured funds had been disposed of.

66.     Shortly after GRANDBERRY had re-transmitted the above-noted money, Capital One Bank notified GRANDBERRY that the wire had been the subject of a recall request based on reported fraud.

67.     GRANDBERRY, HO, and CHIEF ONWA continued to attempt to process fraudulently-procured wire transfers on several additional occasions until at least May 2015, but none were as successful as the above-described $400,000 and $131,000 wire transfers.

### COUNT ONE
### (Wire Fraud)

68.     Paragraphs 1 through 67 are re-alleged here.

69.     Between about May 2012 and about October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY, with intent to defraud, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

70.     On or about March 31, 2014, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, TYRONE GRANDBERRY did transmit and cause to be

16

transmitted, by means of wire communications in interstate commerce between North Carolina and Virginia, writings, signs, and signals which comprised a $150,000 wire transfer from A.M. to OCEAN 27 INTERNATIONAL.

**(Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

## COUNT TWO
### (Money Laundering Conspiracy)

71.     Paragraphs 1 through 67 are re-alleged here.

72.     From on or about October 2014 through May 2015, in the District of Columbia and elsewhere, TYRONE GRANDBERY, RAYMOND HO, and a person known as CHIEF ONWA, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, to wit:

(a)    to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b)    to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived

17

property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1957.

73.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

(a)     CHIEF ONWA would procure the proceeds that were the subject of the conspiracy;

(b)     TYRONE GRANDBERRY would maintain bank accounts in the United States;

(c)     TYRONE GRANDBERRY, RAYMOND HO, and CHIEF ONWA would coordinate the receipt and distribution of the proceeds, through e-mails and other communications between the conspirators;

(d)     TYRONE GRANDBERRY, RAYMOND HO, and CHIEF ONWA would agree to the division of the proceeds, such that all three would share in the proceeds;

(e)     TYRONE GRANDBERRY would quickly re-transmit the proceeds from the initial recipient bank accounts to additional bank accounts, including accounts controlled by each of the conspirators, in transactions involving more than $10,000.

(**Conspiracy,** in violation of Title 18, United States Code, Section 1956(h))

## COUNT THREE
### (Engaging in Monetary Transactions)

74.     Paragraphs 1 through 67 are re-alleged here.

75.     On or about November 20, 2014, TYRONE GRANDBERRY did knowingly engage and attempt to engage in a monetary transaction by through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that

is, the transfer of $55,000 of funds from Bank of America to TD Bank, such property having been derived from a specified unlawful activity, that is, wire fraud.

(**Engaging in Monetary Transactions,** in violation of Title 18, United States Code, Section 1957)

## COUNT FOUR
### (Money Laundering - Concealment)

76.　　Paragraphs 1 through 67 are re-alleged here.

77.　　On or about January 26, 2015, TYRONE GRANDBERRY did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, a wire transfer of $110,000 from Capital One Bank to TD Bank, which involved the proceeds of a specified unlawful activity, that is wire fraud, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, source, ownership, and control of the proceeds of said specified unlawful activity and that, while conducting and attempting to conduct such financial transaction, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

(**Money Laundering – Concealment,** in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i))

## COUNT FIVE
### (Wire Fraud)

78.　　Paragraphs 1 through 67 are re-alleged here.

79.　　Between about May 2012 and about October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY, with intent to defraud, knowingly devised and intended to

devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

80.     On or about May 4, 2015, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, TYRONE GRANDBERRY did transmit and cause to be transmitted, by means of wire communications in interstate commerce between Maryland and Virginia, writings, signs, and signals which comprised a $200,000 wire transfer from VENTRICLE to OCEAN 27.

(**Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

## COUNT SIX
## (Wire Fraud)

81.     Paragraphs 1 through 67 are re-alleged here.

82.     Between about May 2012 and about October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY, with intent to defraud, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

83.     On or about December 9, 2015, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, TYRONE GRANDBERRY did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce between Switzerland and Virginia, writings, signs, and signals which comprised a €3,000,000 wire transfer from OCTAFIN to OCEAN 27.

(**Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

## COUNT SEVEN
**(Engaging in Monetary Transactions)**

84.     Paragraphs 1 through 67 are re-alleged here.

85.     On or about December 10, 2015, TYRONE GRANDBERRY did knowingly engage

and attempt to engage in a monetary transaction by through or to a financial institution, affecting

interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that

is, the transfer of $660,000 of funds from TD Bank to SunTrust Bank, such property having been

derived from a specified unlawful activity, that is, wire fraud.

(**Engaging in Monetary Transactions,** in violation of Title 18, United States Code, Section
1957)

## COUNT EIGHT
**(Aggravated Identity Theft)**

86.     Paragraphs 1 through 67 are re-alleged here.

87.     On or about January 7, 2016, TYRONE GRANDBERRY, during and in relation to

a felony violation enumerated in 18 U.S.C. § 1028A(c), that is, wire fraud, in violation of 18 U.S.C.

§ 1343, did knowingly possess and use, without lawful authority, a means of identification of

another person, that is, the name and signature of M.C., a TD Bank employee, knowing that said

means of identification belonged to another actual person.

(**Aggravated Identity Theft,** in violation of Title 18, United States Code, Section 1028A)

## COUNT NINE
**(Bank Fraud)**

88.     Paragraphs 1 through 67 are re-alleged here.

89.     Between about January 2016 and October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY knowingly devised and intended to devise, a scheme and artifice to defraud TD Bank, a United States financial institution, and to obtain moneys, funds, credits, assets, securities or other property owned or under the custody or control of TD Bank, by means of materially false or fraudulent pretenses, representations, or promises.

90.     On or about January 27, 2016, TYRONE GRANDBERRY knowingly executed the scheme and artifice to defraud as set forth above, in that TYRONE GRANDBERY submitted a loan application containing materially false statements, all in furtherance of his attempt to gain access to money that TD Bank had frozen.

91.     TD Bank was a financial institution within the meaning of Title 18, United States Code, Section 20, having accounts insured by the Federal Deposit Insurance Corporation, with its principal place of business located in New Jersey.

**(Bank Fraud,** in violation of Title 18, United States Code, Section 1344(2))

## COUNT TEN
### (Wire Fraud)

92.     Paragraphs 1 through 67 are re-alleged here.

93.     Between about May 2012 and about October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY, with intent to defraud, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

94.     On or about January 26, 2016, in the District of Columbia and elsewhere, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, TYRONE

GRANDBERRY did transmit and cause to be transmitted, by means of wire communications in interstate commerce between Virginia and Washington, D.C., writings, signs, and signals which comprised an e-mail from A.E. to GRANDBERRY and attorney B.S.

(**Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

## COUNT ELEVEN
### (Mail Fraud)

95.     Paragraphs 1 through 67 are re-alleged here.

96.     Between about May 2012 and about October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY, with intent to defraud, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

97.     On or about September 9, 2016, in the District of Columbia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud, and attempting to do so, TYRONE GRANDBERRY knowingly caused the United States Postal Service to deliver mail matter, that is, an envelope containing a letter from TD Bank to W.J., from New Jersey to Washington, D.C.

(**Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

## COUNT TWELVE
### (First Degree Fraud)

98.     Paragraphs 1 through 67 are re-alleged here.

99.     Between about May 2012 and about October 2016, in the District of Columbia and elsewhere, TYRONE GRANDBERRY engaged in a scheme and systematic source of conduct with

intent to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and thereby obtained money and property that had a value of $1,000 or more, consisting of money which was obtained from S.G., E.E., A.M., J.G., VENTRICLE, and OCTAFIN.

(**First Degree Fraud,** in violation of Title 22, D.C. Code, Sections 3221(a), 3222(a))

## COUNT THIRTEEN
### (Document Fraud)

100.    Paragraphs 1 through 67 are re-alleged here.

101.    On or about October 28, 2016, TYRONE GRANDBERRY did knowingly possess a document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, that is an Austrian passport, in the name Tyrone Staindl, which the defendant knew to be procured by means of a false claim and statement, and otherwise procured by fraud, in that the defendant possessed a forged and fraudulent document, purporting to be a birth certificate showing that he was entitled to claim Austian citizenship, in violation of Title 18, United States Code, Section 1546(a).

(**Document Fraud,** in violation of Title 18, United States Code, Section 1546(a))

## FORFEITURE ALLEGATION

### Mail and Wire Fraud Offenses

1.    Upon conviction of any of the offenses listed in Counts One, Five, Six, Ten, and/or Eleven of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2.      The United States will also seek the forfeiture of the following specific property, that is, $2,123,033.57 that was seized from a TD Bank account ending in 5285.

3.      The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

4.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third party;

   c.      has been placed beyond the jurisdiction of the Court;

   d.      has been substantially diminished in value; or

   e.      has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

## Money Laundering Offenses

5.      Upon conviction of any of the offenses listed in Counts Two, Three, Four, and/or Seven of this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in these offenses or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

6.      The United States will also seek a forfeiture money judgment against the defendant

equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

7.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 982(a)(1), and Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
Foreperson

_Jessie K. Liu_ /JPH
JESSIE K. LIU
UNITED STATES ATTORNEY IN AND FOR
THE DISTRICT OF COLUMBIA